|  |  |
|---|---|
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **SOUTHERN AIR, INC.,** <br><br> Defendant. | <br><br><br> Case No. 19-cv-1948 (CRC) |

## <u>MEMORANDUM OPINION</u>

Two airlines, Southern Air and Atlas Air, have been in the midst of a merger since 2016. The union representing pilots from both carriers—the International Brotherhood of Teamsters— and the airlines disagree about their respective obligations under the merger provisions in each airlines' collective bargaining agreements. After the airlines successfully compelled the union to submit their disputes to arbitration, both the Southern Air and Atlas Air arbitration boards entered awards in favor of the airlines. The union filed separate petitions in this Court to vacate the awards. This case is before the Court on Southern Air's motion to dismiss the union's petition to vacate the Southern Air Board's award. Finding no plausible basis for vacating the award, the Court will grant the motion to dismiss.[1]

## I.    **Background**

The International Brotherhood of Teamsters ("IBT" or the "Union") is the exclusive bargaining representative of pilots employed by and who fly aircraft for Southern Air

---

[1] The Court is simultaneously issuing an opinion granting Atlas Air's motion to dismiss the union's petition to vacate the Atlas Air arbitration board's award. <u>See</u> <u>Int'l Bhd. of Teamsters v. Atlas Air, Inc.</u>, No. 19-cv-2723.

("Southern" or the "Company"), a world-wide air carrier.   Compl. ¶¶ 4-6.  The Union and the

Company are parties to a collective bargaining agreement (the "Southern CBA") that covers the

rates of pay, rules, and working conditions of IBT-represented pilots employed by Southern.  Id.

¶ 7, Exh. 1 [hereinafter "Southern CBA"].  The Southern CBA establishes a grievance and

arbitration procedure for certain disputes.  See Southern CBA § 19.

In January 2016, Atlas Air Worldwide Holdings ("AAWW") announced that it had

entered into an agreement to acquire Southern Air Holdings, Inc. ("SAHI").  Id. ¶ 12.   SAHI is

the parent company of Southern and another air carrier, Florida West International Airways.  Id.

AAWW is the parent company of Atlas Air and Polar Air (collectively, "Atlas").  Id. ¶ 13.  IBT

also represents the Atlas and Polar-employed pilots, and IBT, Atlas, and Polar are parties to a

collective bargaining agreement (the "Atlas CBA") that is separate from the Southern CBA.  Id.

¶¶ 13-14.  IBT owes separate duties of representation to each pilot group.  Id. ¶ 15.

Upon announcing its intent to acquire SAHI, AAWW announced a plan to operationally

merge Southern into Atlas.  Id. ¶ 16.  The merger provision of the Southern CBA provided that

> [i]n the event of a merger, this Agreement shall be merged with the merging air
> carrier's crewmember collective bargaining agreement, if any; if such merged
> agreement is not completed within nine months from the date an integrated Master
> Seniority List is submitted to the surviving entity, the parties shall submit all
> outstanding issues to binding interest arbitration.

Southern CBA § 1.B.3; Compl. ¶ 8.

Relying on this provision and an analogous one in the Atlas CBA, AAWW demanded

that the Southern and Atlas pilot groups begin negotiations to merge the two pre-existing CBAs

into one and that the Union and the pilot groups immediately begin seniority list integration

negotiations.  Compl. ¶ 16.  The Union and the pilot groups refused both demands.  Id. ¶ 17.  In

April 2016, Atlas filed a management grievance against the Union alleging that the Union had

breached their CBA by refusing to engage in joint collective bargaining agreement ("JCBA") or integrated seniority list ("ISL") negotiations.  Id. ¶ 18.  The Union responded that it was not required to arbitrate the grievance.  Id.

In January 2017, Southern purported to submit a management grievance against the Union for refusing to engage in JCBA negotiations (the "Southern Grievance").  Id. ¶ 19.  Unlike the Atlas CBA, the Southern CBA does not contain any express provision that allows management grievances.  Id. ¶ 18.  The Union responded that it would not arbitrate the Southern Grievance because, among other things, the Southern CBA did not permit the arbitration of management-initiated grievances.  Id. ¶ 20.

Southern and Atlas then brought suit against the Union in the United States District Court for the Southern District of New York to compel the Union to arbitrate their respective grievances.  Id. ¶ 21.  Judge Forrest granted the airlines' motion to compel arbitration of both grievances in March 2018, Atlas Air, Inc. v. Int'l Bhd. of Teamsters, 293 F. Supp. 3d 457 (S.D.N.Y. 2018), which was affirmed by the Second Circuit in November 2019, Atlas Air, Inc. v. Int'l Bhd. of Teamsters, 943 F.3d 568 (2d Cir. 2019).

The Southern System Board of Adjustment (the "Board") heard the Southern Grievance. The Union moved to dismiss on the ground that the Southern CBA grievance and arbitration procedure does not permit management grievances.  Compl. ¶ 24.  Arbitrator Richard Bloch issued an Opinion and Award in Southern's favor in June 2019.  Id. ¶ 25, Exh. 3 [hereinafter "Op. & Aw."].  The Board concluded that the Southern CBA did permit management grievances

and that the Union and pilot groups had violated the merger provisions of the CBA by refusing to engage in JCBA or ISL negotiations. [2] Id. at 20-23.

IBT then filed suit in this Court seeking to vacate the Southern Board's Opinion and Award. Southern filed a motion to dismiss for failure to state a claim. Seeing no basis to vacate the arbitrator's award, the Court will grant Southern's motion.

## II.   Legal Standards

The Railway Labor Act ("RLA") "provide[s] for the prompt and orderly settlement of all disputes" between air carriers and their employees. Landers v. Nat'l R.R. Passengers Corp., 485 U.S. 652, 656 (1988) (quoting 45 U.S.C. § 151a(5)). To that end, it requires carriers and employees to form collective bargaining agreements and creates two types of dispute resolution procedures, which vary based on whether the dispute is "major" or "minor." See Consol. Rail Corp. v. Ry. Labor Exec. Ass'n, 491 U.S. 299, 302 (1989).

"[M]ajor disputes are those over the formation of collective agreements" affecting employees' rates of pay, rules, or working conditions "or efforts to secure them." Union Pac. R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment, Cent. Region, 558 U.S. 67, 72 n.1 (2009) (internal quotation marks omitted). Given the magnitude of the issues at stake, the RLA establishes a "rather elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation" that governs the resolution of major disputes. Detroit &

---

[2] The Atlas System Board of Arbitration (the "Atlas Board") heard Atlas's grievance in October 2018. As of IBT's filing of this suit, the Board had not yet issued a decision, but it issued a Decision and Award in favor of Atlas in late August 2019. IBT then filed suit to vacate that award as well, which, as noted above, the Court addresses in a separate opinion. See Int'l Bhd. of Teamsters v. Atlas Air, Inc., No. 19-cv-2723.

T. S. L. R. Co. v. United Transp. Union, 396 U.S. 142, 148-49 (1969) (citing Gen. Comm. of Adjustment v. Missouri-Kansas-Texas R.R. Co., 320 U.S. 323, 328-33 (1943)).

A minor dispute, by contrast, "involves a question about how to interpret an existing collective bargaining agreement, like the meaning of a term or whether the agreement permits a certain action." Atlas Air, Inc. v. Int'l Bhd. of Teamsters, 928 F.3d 1102, 1108 (D.C. Cir. 2019) (citing Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 723 (1945)). The Second Circuit determined that the Southern Grievance constituted a minor dispute, which the parties do not contest. The framework for resolving minor disputes is considerably less involved: disputes are first submitted to the grievance procedure agreed upon in the CBA and, if unsuccessful, are submitted to mandatory arbitration before the National Railroad Adjustment Board or, as here, a special board of adjustment established by the carrier and the union. See Norfolk S. Ry. Co. v. Solis, 915 F. Supp. 2d 32, 36 (D.D.C. 2013); 45 U.S.C. § 153 First (i).

"Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts." Union Pac. R. Co. v. Sheehan, 439 U.S. 89, 94 (1978). The RLA thus makes the mandatory arbitration process exclusive of all other remedies and an award issued by the board "final and binding." 45 U.S.C. § 153 First (m); see Andrews v. Louisville & Nashville R.R. Co., 406 U.S. 320, 322-24 (1972). Judicial review of such awards is available only on grounds of: (1) failure to comply with the requirements of the RLA; (2) failure to confine the decision to matters within the scope of the board's jurisdiction; (3) fraud or corruption; and (4) contravention of law and public policy. See 45 U.S.C. § 153 First (q); Sheehan, 439 U.S. at 93; Nat'l R.R. Passenger Corp. v. Fraternal Order of Police, Lodge 189 Labor Comm., 855 F.3d 335, 338 (D.C. Cir. 2017).

To withstand Southern's motion to dismiss, then, the Union's complaint must allege facts that support at least one of the above-mentioned grounds for judicial review. The Court must grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if the complaint's allegations do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In making that determination, the Court "must take all of the factual allegations in the complaint as true," save legal conclusions "couched as . . . factual allegation[s]." Id. (citing Twombly, 550 U.S. at 555). The Court may not consider materials outside the pleadings, except "documents attached as exhibits or incorporated by reference in the complaint," Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011), and documents attached to a motion to dismiss if their "authenticity is not disputed," "they are referred to in the complaint," and they "are integral to [the plaintiff's] claim[s]," Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004) (citations omitted).

## III. Analysis

### A. Count I: Challenges to the Board's Liability Finding

In granting the Southern Grievance, the Board decided two issues: whether it had jurisdiction over the Southern Grievance and whether the Union violated the Southern CBA by refusing to present the Company with an ISL or engage in JCBA negotiations. See Op. & Aw. 4. The Court concludes that it may not vacate the Board's decision on either score.

#### 1. The Board's Jurisdiction to Hear the Company's Grievance

The Board framed the first issue as whether it "ha[d] jurisdiction over the Company's grievance." Id.; see Madison Hotel v. Hotel & Rest. Emps., Local 25, AFL-CIO, 144 F.3d 855, 857 (D.C. Cir. 1998) ("An arbitrator's view of the issues submitted to him for

arbitration . . . receives the same judicial deference as an arbitrator's interpretation of a collective bargaining agreement."). Count I of the complaint alleges that the Board erred in finding that it had jurisdiction to hear the Southern Grievance because Southern did not have a right under the CBA to compel the Union to arbitrate a Company-initiated grievance. Compl. ¶ 38.

Southern responds that the Court must defer to the Board's determination that it had a right to pursue a management grievance so long as the Board's interpretation is "rationally explainable as a logical means of furthering the aims of the contract." Def. Mot. to Dismiss 10 (quoting Union Pacific R.R. Co. v. United Transp. Union, 23 F.3d 1397, 1399 (8th Cir. 1994)). That is the incorrect standard of review. As the Supreme Court has explained, unless the parties agree otherwise, "the question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986).[3] This threshold issue of arbitrability encompasses both "*whether or not the company [or the union] was bound to arbitrate*, as well as what issues it must arbitrate." Atkinson v. Sinclair Ref. Co., 370 U.S. 238, 241 (1962) (emphasis added).

---

[3] The parties may agree by contract to submit "question[s] of whether the parties agreed to arbitrate" to arbitration. AT & T, 457 U.S. at 649. But, the parties do not suggest—nor does anything in the language of the Southern CBA indicate—that they "clearly and unmistakably" agreed to do so here. Id. The CBA's grant to the Board of "jurisdiction over disputes growing out of grievances or out of the interpretation or application of any of the terms of this Agreement" does not clearly encompass threshold questions concerning arbitrability. Southern CBA § 19.D.2. Moreover, the Union has consistently refused to submit to this arbitration on the basis that the Southern Grievance was not arbitrable. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947 (1995) ("[I]nsofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with First Options, one naturally would think that they did *not* want the arbitrators to have binding authority over them." (emphasis in original)).

Ordinarily, then, the Court would review the Board's jurisdiction over the Southern Grievance *de novo*, employing ordinary principles of contract interpretation with the presumption that arbitration should be upheld "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT & T, 475 U.S. at 650 (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582-83 (1960)). Here, however, the Court concludes that it is precluded from undertaking such review by the Second Circuit's decision in Atlas Air, Inc., 943 F.3d at 568. Cf. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12 (1983) (noting in the Pullman abstention context that "[o]nce the state court decided the issue of arbitrability, the federal court would be bound to honor that determination as res judicata").[4]

Issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748-49 (2001)). It is intended to "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" Id. (quoting Montana v. United States, 440 U.S. 147, 153-54 (1979)) (alterations in original).

Issue preclusion has three elements: (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue

---

[4] On November 26, 2019, the Court invited the parties to submit supplemental briefing on whether the Second Circuit's decision in Atlas Air, 943 F.3d at 568, and/or Judge Forrest's decision in Atlas Air, Inc., 293 F. Supp. 3d at 457, preclude it from ruling that the Board lacked jurisdiction over the Southern Grievance because it was not brought by the Union. See Minute Order (Nov. 26, 2019).

must have been actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." Martin v. Dep't of Justice, 488 F.3d 446, 454 (D.C. Cir. 2007) (quoting Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992)). The Court concludes that each of these elements is met here with respect to the issue of the arbitrability of a Company-initiated grievance under the Southern CBA.

*First*, the question was contested by the parties throughout this litigation and squarely submitted to both Judge Forrest and the Second Circuit. The Union has insisted, from its initial response to Southern's demand for arbitration, that Southern did not have a right under their CBA to bring grievances before the Board. See Compl. ¶ 20. In their briefing before Judge Forrest, Southern asserted that it had such a right, Pl. Mem. in Supp. Mot. Summ. J. 20, Atlas Air, Inc. v. Int'l Bhd. of Teamsters., No. 17-cv-903 (S.D.N.Y. Apr. 20, 2017), ECF No. 36, and the Union responded that the "Court ha[d] no jurisdiction to compel arbitration of a management grievance" because "the IBTAD-Southern CBA does not authorize management to file a grievance," Def. Mem. in Opp. Mot. Summ. J. 37-38, Atlas Air, Inc. v. Int'l Bhd. of Teamsters, No. 17-cv-903 (S.D.N.Y. June 5, 2017), ECF No. 46. In seeking reversal of Judge Forrest's decision before the Second Circuit, the Union again argued that "the District Court had no jurisdiction to compel arbitration of a management grievance" because "the Southern CBA does not authorize management to file a grievance," Appellants' Br. 48, Atlas Air, Inc. v. Int'l Bhd. of Teamsters, No. 18-1086 (2d Cir. July 26, 2018), and Southern again argued otherwise, Appellee's Br. 40, Atlas Air, Inc. v. Int'l Bhd. of Teamsters, No. 18-1086 (2d Cir. Oct. 25, 2018). In both cases, the parties vigorously disputed the question at issue.

*Second*, the question was "actually and necessarily determined by a court of competent jurisdiction." Martin, 488 F.3d at 454. The Union argues that Judge Forrest did not actually decide whether Southern's grievance was arbitrable; she decided only that the dispute was a minor one and thus subject to the Board's jurisdiction. Pl. Opp. Supp. Br. 3. And, the Union says, because the Second Circuit's holding that Southern's grievance was arbitrable was thus unnecessary to its affirmance of her decision, its decision cannot provide a basis for preclusion either. Id. at 3-5.

The Union ignores, however, Judge Forrest's explicit ruling that its argument that "the specific issues here are not arbitrable by the relevant adjustment boards" was "unavailing." Atlas Air, 293 F. Supp. 3d at 468. To be sure, Judge Forrest did not expressly address the Union's argument that the Southern CBA did not authorize management to file a grievance.[5] But, "[i]n issue preclusion, it is the prior *judgment* that matters, not the court's opinion explicating the judgment." Yamaha, 961 F.2d at 254 (emphasis in original). "Even in the absence of *any* opinion[,] a judgment bars relitigation of an issue necessary to the judgment." Am. Iron & Steel Inst. v. E.P.A., 886 F.2d 390, 397 (D.C. Cir. 1989) (emphasis in original).

---

[5] As relevant here, Judge Forrest held that

> [The Union's] argument that the Southern Adjustment Board lacks jurisdiction to consider this dispute is plainly incorrect. The Southern CBA provides that the Southern Adjustment Board's jurisdiction "shall not extend to proposed changes in hours of employment, rates of compensation, or working conditions." But as previously noted, the actual *terms* of the JCBA are not at issue here—the sole issue is whether the Union must negotiate. That issue turns on interpretation of § 1.B.3 of the Southern CBA, and the Southern Adjustment Board unquestionably has jurisdiction "over disputes growing out of . . . the interpretation or application of any of the terms" of the Southern CBA.

Atlas Air, 293 F. Supp. 3d at 469 n.17 (quoting Southern CBA § 19.D.2).

Courts may not compel arbitration of disputes that are not arbitrable. See Air Line Pilots Ass'n, Int'l v. Delta Air Lines, Inc., 863 F.2d 87, 91 (D.C. Cir. 1988) (noting that "an issue need not be subject to arbitration if there is 'positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute'" (quoting Nw. Airlines v. ALPA, 808 F.2d 76, 82 (D.C. Cir. 1987)); see generally Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (noting that the Federal Arbitration "Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed" (emphasis in original)). The parties squarely raised—in *addition* to the question whether the Southern Grievance was a "minor" or "major" dispute—the question of the grievance's arbitrability. In compelling the parties to submit the Southern Grievance to arbitration, Judge Forrest thus actually and necessarily decided that such grievances, *i.e.*, those initiated by the Company, were arbitrable. [6] See 18 Wright & Miller Fed. Prac. & Proc. Juris. § 4420 (3d ed. 2002) ("[T]he

-----

[6] There is an argument to be made that Judge Forrest's decision precluded the Board from deciding whether the CBA permitted management to file grievances, such that the Board should never have reached that question at all. See Op. & Aw. 11 n.16 (noting Southern's argument that "[h]ad the District Court not already held that the management grievance was proper . . . it would not have ordered the merits of the grievance to arbitration" (quoting Southern Mot. to Dis. Br. at 7)). The Board itself grappled with this question, noting that Judge Forrest "concluded that the dispute was arbitrable," but "it is not as clear that the Court also ruled on the merits of whether a grievance by Management could be filed." Id. at 11. The Board ultimately concluded that it was not precluded from reaching "the merits of that question." Id.

The Court questions the Board's framing of the question "whether a grievance by Management could be filed" as one "on the merits," as opposed to one of arbitrability. See Atkinson, 370 U.S. at 241 (noting that arbitrability encompasses both "*whether or not the company was bound to arbitrate*, as well as what issues it must arbitrate" (emphasis added)). The better reading of Judge Forrest's decision, in the Court's view, is that her holding that the Southern Grievance was arbitrable *necessarily* encompassed a finding that Southern was permitted to submit grievances under the CBA. In any event, the Court need not delve into the validity of the Board's issue preclusion analysis, because it concludes that the Second Circuit's

11

simple fact of victory or defeat of a plaintiff or defendant establishes decision of all the issues that would have had to be resolved to support the result.").

In any case, the arbitrability of the Southern Grievance was conclusively resolved by the Second Circuit. In affirming Judge Forrest's decision, the Second Circuit expressly rejected each of the Union's "arguments with respect to the arbitrability of the Employers' management grievances," including its argument that "the Southern CBA does not permit the employer to file a grievance that could be the basis of arbitration." Atlas Air, 943 F.3d at 584. After examining the language in the Southern CBA, the Second Circuit explicitly held that the CBA "permitted [Southern] to unilaterally file a grievance with the Southern Board." Id.

The Union contends that "it is not certain that the Second Circuit intended to decide an issue that Judge Forrest purposefully had not decided because she believed she lacked jurisdiction to render any such decision at all." Pl. Opp. Supp. Br. 5. To the extent that the Union is arguing that the Second Circuit's holding was unnecessary to its affirmance of Judge Forrest's decision, the Union ignores the well-established principle that courts, not arbitrators, "*must* decide whether a collective bargaining agreement requires the parties to arbitrate a grievance unless the agreement provides otherwise." Atlas Air, 943 F.3d at 584 (emphasis added) (citing AT & T Techs., 475 U.S. at 649; Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995)). The Second Circuit was thus *required* to decide whether the Southern Grievance was arbitrable, and its conclusion that management was permitted to file grievances was thus necessary to its affirmance of Judge Forrest's order compelling arbitration

---

decision in Atlas Air, 943 F.3d at 584, definitely resolves the Board's jurisdiction to hear management-initiated grievances.

of that grievance.[7]  See Consol. Edison Co. of New York v. Bodman, 449 F.3d 1254, 1258 (D.C. Cir. 2006) ("If this issue was actually and necessarily decided, the prior decision would be conclusive and require dismissal of the Claimants' complaint, which seeks the opposite result."). Southern's right to submit a grievance under the CBA was thus "actually and necessarily determined by a court of competent jurisdiction."  Martin, 488 F.3d at 454.

*Finally*, preclusion does not "work a basic unfairness" to the Union.  Id.  The D.C. Circuit has "limit[ed] equitable exceptions to issue preclusion to certain limited circumstances": (1) "if there has been an intervening change in controlling legal principles;" (2) "if the party to be bound lacked an incentive to litigate in the first trial, especially in comparison to the stakes of the second trial"; or (3) "if the prior proceedings were seriously defective."  Canonsburg Gen. Hosp. v. Burwell, 807 F.3d 295, 306 (D.C. Cir. 2015) (internal quotation marks omitted).  None apply here.

The Union argues that the decisions of Judge Forrest and the Second Circuit are inconsistent with well-settled Supreme Court precedent.  Pl. Opp. Br. 5-6.  But, "issue preclusion prevents relitigation of wrong decisions just as much as right ones."  B & B Hardware, Inc., 575 U.S. at 157 (internal quotation marks omitted); see also Canonsburg Gen. Hosp., 807 F.3d at 306

---

[7] To the extent that the Union attaches significance to the fact that "[t]he Second Circuit did not render its decision affirming Judge Forrest's decision until approximately five months after the Southern System Board issued its decision and award," Pl. Opp. Supp. Br. 4, that does not alter the preclusive effect of the Second Circuit's decision on *this* Court's review of the Southern Board's decision.  See, e.g., Wright & Miller, 18 Fed. Prac. & Proc. Juris. § 4404 (3d ed. 2002) ("[T]he first judgment in time establishes preclusion in any other action, no matter which action was filed first."); U.S. ex rel. Sheldon v. Kettering Health Network, 816 F.3d 399, 416 (6th Cir. 2016) ("[T]he relevant inquiry for res judicata is which action resulted in judgment first, not which action was filed first."); Giragosian v. Ryan, 547 F.3d 59, 63-65 (1st Cir. 2008) ("[W]hen two actions are pending on the same claim or issue, the first judgment becomes conclusive in the other action, regardless of the order in which the actions were brought.").

("[E]ven a 'patently erroneous' first judgment is insufficient to bar issue preclusion.'" (quoting Otherson v. Dep't of Justice, 711 F.2d 267, 273 (D.C. Cir. 1983))). The Union does not identify any *intervening* legal precedents that would render the application of preclusion unfair here.

Nor has the Union made "a compelling showing of unfairness" with respect to the adequacy of its incentives to litigate the question at issue in the earlier litigation. Id. (explaining that "if there is mutuality of parties in successive litigation, . . . 'courts should refuse to give the first judgment preclusive effect on grounds that the party lacked adequate incentive to litigate in the first proceeding *only* upon a *compelling* showing of unfairness'" (quoting Otherson, 711 F.2d at 277) (emphasis in original)). In opposing the Company's motion to compel arbitration of the Southern Grievance, the Union had every incentive to argue that the grievance was not arbitrable; doing so successfully would have defeated the motion. Moreover, "there is no concern about procedural defects" in the proceedings before Judge Forrest or the Second Circuit. Id. Accordingly, the Court finds that giving preclusive effect to the Second Circuit's decision does not work a basic unfairness to the Union.

Finding that all three elements of issue preclusion met, the Court concludes that it must give preclusive effect to the Second Circuit's holding that the Southern CBA permits the Company to submit grievances to arbitration. Accordingly, it may not vacate the Southern Board's decision on the ground that the management-initiated grievance was not arbitrable.

### 2. The Board's Decision on the Merits

With respect to the merits of the underlying contractual dispute, the Board concluded that the Union had breached the Southern CBA by refusing to engage in JCBA or ISL negotiations. Op. & Aw. 22. The Southern CBA provides that

> [i]n the event of a merger, this Agreement shall be merged with the merging air carrier's crewmember collective bargaining agreement, if any; if such merged

> agreement is not completed within nine (9) months from the date an integrated
> Master Seniority List is submitted to the surviving entity, the parties shall submit
> all outstanding issues to binding interest arbitration.

Southern CBA § 1.B.3. The Board concluded that the announced merger between

Southern and Atlas was sufficiently far along such that the Union was obligated—under

the terms of Section 1.B.3—to participate in JCBA negotiations, "including the germinal

step of producing an ISL." Op. & Aw. 18-19, 22.

    The Union first alleges that the Board's finding on this score should be vacated because

"despite abundant evidence that Southern and Atlas had not merged into 'one unified corporate

entity,' as required under Section 1.B.2 of the Southern CBA, Arbitrator Bloch sustained the

Southern Grievance." Compl. ¶ 25. The Court's inquiry with respect to this challenge is "is not

whether the arbitrator's decision is wrong on the merits, but whether his decision draws its

essence from the parties' CBA." U.S. Postal Serv. v. Am. Postal Workers Union, 553 F.3d 686,

693 (D.C. Cir. 2009).

    The Board's reasoning shows that it was interpreting the contractual term "merger,"

which the CBA defined to "refer to a transaction in which the functional departments of the

Company (e.g., operations, marketing, finance, human resources, etc.) are integrated with those

of another certificated air carrier employing crewmembers, and in such a manner that only one

unified corporate entity remains." Southern CBA § 1.B.2. The Board rejected the Union's

reading of the contractual phrase "are integrated" to mean "fully and finally integrated." Op. &

Aw. 18. The Board concluded—in light of the fact that "[s]ubsection B.3 speaks to a scenario

wherein the process of achieving an integrated seniority list and a joint CBA are part of a

continuum in completing the desired unified corporate entity"—that the CBA did not require

"the necessary steps of combining the pilot workforce [to] await finalization of all other

elements." Id. at 18-19. And, based on that reading of the CBA—as well as evidence that all functional departments had been integrated and that Atlas and Southern had adopted the same Flight Operations Manual, non-pilot training programs, employment policies and handbook, financial systems and process, IT systems, and operating systems—the Board concluded that a "merger" was sufficiently in place. There is no basis for finding that the Board "stray[ed] from interpretation and application of the agreement" in so concluding. Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001).

The Union also challenges the Board's conclusion that the parties were not required to initiate and complete RLA § 6 bargaining prior to merging the two CBAs. Compl. ¶ 39; Op. & Aw. 19-22. Under Section 27 of the operative CBA, the CBA was set to "renew itself without change" after November 6, 2016, "unless written notice by either party of intended change is served in accordance with [RLA] Section 6 . . . , no more than three hundred and sixty-five (365) days prior to November 6, 2016." Southern CBA § 27.A. Section 27 outlined a progressive dispute resolution process, including six months of direct negotiations, followed by expedited facilitated negotiations, and, if necessary, arbitration before the National Mediation Board. Id. §§ 27.B-C.

The Union argued that the processes outlined in Sections 27 and 1.B.3 were intended to operate in tandem: Southern and the Union were required to first exhaust the RLA § 6 negotiations processes contemplated by Section 27 of the CBA before the parties could proceed to the bargaining schedule and dispute settlement mechanism agreed to in Section 1.B.3. Op. & Aw. 21. The Board, drawing a distinction between the processes for negotiating a new Southern-IBT CBA and a joint CBA of two merged companies, rejected the Union's reading. Id. at 21-22. The Board concluded that the nine-month timetable and potential interest arbitration set forth in

Section 1 was the only procedure "directly applicable to, and controlling of, bargaining surrounding a new, unrelated JCBA." Id.

The Union has not shown that the Board's decision on this score did not "draw[] its essence from the parties' CBA." U.S. Postal Serv., 553 F.3d at 693. The Board evaluated the structure of the CBA when it concluded that Section 1 was the only provision that applied directly to the situation at hand. See generally RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) ("[W]here general and specific authorizations exist side-by-side, the general/specific canon avoids rendering superfluous a specific provision that is swallowed by the general one."). Choosing between two competing interpretations of contractual provisions is precisely the type of dispute that the parties agreed to submit to arbitration; "so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 599 (1960).

B. Challenges to the Board's Remedy

The Union also raises several challenges the specific remedy that the Board imposed—a 45-day deadline for the Union to produce an ISL. See Op. & Aw. 23.

1. Count II: Whether the Remedy Drew Its Essence From the CBA

Although arbitrators are given substantial flexibility in crafting remedies for contractual violations, an arbitral "award is legitimate only so long as it draws its essence from the collective bargaining agreement." Enter. Wheel, 363 U.S. at 597. The Union has not shown that the Board's remedy failed to draw its essence from the Southern CBA.

To the extent that the Union's argument is premised on the fact that the Southern CBA does not expressly specify any particular "timeframe on the commencement, duration, or

endpoint of the seniority integration process," Pl. Opp. 5, that alone is an insufficient basis for vacating the Board's decision.  Relying on mandatory language in the merger provisions, see, e.g., Southern CBA § 1.B.2 ("In the event of a merger . . . , there *shall* be an integration of the two crewmember groups . . . ." (emphasis added)); id. § 1.B.3 ("In the event of a merger, this Agreement *shall* be merged with the merging air carrier's crewmember collective bargaining agreement, if any . . . ." (emphasis added)), the Board concluded the CBA made "participation in the process of merging . . . mandatory," Op. & Aw. 22.  Although the Board acknowledged that this conclusion "d[id] not answer the question of 'when?,'" it proceeded from the "premise codified in Sections 1.B.2 and 3—that the merger process encompasses the work of both parties"—to conclude that the parties "share[d] a current obligation of joint cooperation," which encompassed an "expectation of timely performance."  Id.

The fact that the CBA did not define timely performance does not mean that the Board exceeded its authority in setting a specific deadline for the Union's compliance with its obligations under Section 1.  See generally Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union, 589 F.3d 437, 443 (D.C. Cir. 2009) ("The fact that an arbitrator relies on a substantive background principle of law or an established canon of construction—and does not follow the plain text of a contract—does not automatically mean the arbitrator has gone rogue.").  Given the "delay inspired by the Union's misapprehension of the contractual requirements" and the "recognition that the workforces are relatively small—some 2,000 pilots," the Board concluded that 45 days was a reasonable timeframe for the Union's production of an ISL.  Op. & Aw. 23.  That conclusion falls within the substantial "flexibility" given to arbitrators "when it comes to formulating remedies."  Enter. Wheel, 363 U.S. at 597.  Accordingly, the Court

concludes that the complaint does not plausibly allege that the Board exceeded its authority in imposing a 45-day deadline for the Union's submission of an ISL.

The Union also alleges that remedy was unlawful because it "appli[ed] to Atlas-Polar pilots who are covered under a separate bargaining agreement, and pertain[ed] to a matter subject to a separate System Board's jurisdiction." Compl. ¶ 41.[8] Both the Southern CBA and Atlas CBA contained provisions that obligated the Union to present an ISL and participate in JCBA negotiations upon certain triggering events; both boards were directed to make an "independent determination" as to whether such triggering events had occurred under the respective CBAs. Atlas Air, 943 F.3d at 585. Complying with that directive, the Southern Board ordered only the Southern pilots—through the Union—to present an ISL to Southern within 45 days and to participate in subsequent JCBA negotiations, and, if necessary, interest arbitration.

Nothing in the Southern Board's decision purports to bind Atlas pilots. See id. ("Nothing in the process of interpreting the provisions of the two collective bargaining agreements purports to bind Atlas or Southern pilots to the terms of another existing collective bargaining agreement."). The fact that the creation of an integrated seniority list may, as a practical matter, require Atlas pilots' participation does not mean that the Southern Board exceeded its authority by imposing a 45-day deadline for the Southern pilots to present one to Southern.[9] See

_____

[8] Count V alleges that "[t]he Union, as representative of the Atlas-Polar pilots, and the Atlas-Polar Pilots are not subject to the jurisdiction of the Southern System Board of Adjustment and the Southern Decision does not apply to them with respect to their obligations under the Atlas-Polar CBA." Compl. ¶ 52. The Court sees no substantial difference between the Union's allegations in Count II and Count V so will consider them together.

[9] The Southern CBA does not mandate any procedure for the creation of an ISL, and there was "no evidence in the record" before Arbitrator Bloch as to "how long it will take to generate the ISL," although "[t]he Union . . . did suggest it could be done relatively quickly. Op. & Aw. 23 & n.42. There was nothing in the record to suggest that the creation of an ISL would

Arrowhead Glob. Sols., Inc. v. Datapath, Inc., 166 F. App'x 39, 45 (4th Cir. 2006) (The fact that a party's compliance with an arbitral award "may, as a practical matter, have an incidental effect on other parties . . . does not prevent the arbitrators from exercising the power that they do have to [issue such relief].").  The Atlas pilots remain free to contest their obligations under the merger provisions of their own CBA[10] and to litigate any objections to an ISL or JCBA before the Atlas Board.  Accordingly, the Court concludes that the Award did not exceed the Southern Board's authority under the Southern CBA.

### 2. Counts III and IV: The Remedy's Compliance with Federal Law

#### a. The RLA

The Union also alleges that the Board's decision violates various provisions in the RLA, including 45 U.S.C. §§ 152, 156 & 184.  See Compl. ¶ 45.[11]  None of these provisions provides a basis for vacating the Board's decision.

45 U.S.C. § 184 provides that "[i]t shall be the duty of every carrier and of its employees . . . to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title."  To the extent that the Union's argument is that the

---

require protracted negotiations between Southern and Atlas pilots.  Indeed, the record before the Atlas Board showed that the Union had a past practice for the integration of seniority lists that was potentially as simple as applying a date-of-hire approach.  See Def. Mot. to Dismiss at 20, Int'l Bhd. of Teamsters v. Atlas Air, Inc., No. 19-cv-2723 (D.D.C. Oct. 11, 2019), ECF No. 7.

[10] At the time of the Southern Board's decision, Atlas's separate grievance against the Union was pending before the Atlas Board.  It was later granted in August 2019.

[11] Count III alleges that "[t]he Award of Arbitrator Bloch fails to comply with, and violates the requirements of the Railway Labor Act."  Compl. ¶ 43.  To the extent that Count III alleges the same violations of the RLA as Count IV, it is dismissed as duplicative.  To the extent that Count III alleges any violations independent of the claims in Counts I, II, and IV, it is dismissed as conclusory.  See Iqbal, 556 U.S. at 678.

Southern Board's decision usurps the jurisdiction of the Atlas Board, the Court has already explained how that contention fails.

Nor does the complaint plausibly allege a violation of the status quo provisions of the RLA. The RLA prohibits airline carriers from "chang[ing] the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements *except in the manner prescribed in such agreements* or in section 156 of this title." 45 U.S.C. § 152 Seventh (emphasis added).

To the extent that the Union's argument is that the Board's decision effects "change[s] [in] the rates of pay, rules, or working conditions" of Southern pilots, the Union has not shown that such changes would be effected in a "manner" other than one "prescribed" in the Southern CBA. Id. As the Court has explained, the Board permissibly held that the expedited JCBA negotiations and interest arbitration procedure mandated in the event of a "merger" by Section 1 of the Southern CBA displaces the prolonged RLA Section 6 negotiations procedure contemplated by Section 27 of the CBA. Holding the Union to its obligations under Section 1 of the CBA to present an ISL and negotiate a JCBA—in lieu of RLA Section 6 negotiations—does not run afoul of the status quo provisions of the RLA. See, e.g., Air Line Pilots Ass'n v. Alaska Airlines, Inc., No. C05-0897L, 2005 WL 2898140, at *1 (W.D. Wash. Oct. 28, 2005) ("The Railway Labor Act allows parties to follow their own contractually negotiated procedures for amending their collective bargaining agreements in lieu of the lengthy procedures set forth in the statute." (citations omitted)).

To the extent that the Union's argument is that the Southern Board's decision impermissibly affects the "rates of pay, rules, or working conditions" of *Atlas* pilots, the Union has not shown how it does so. As Southern points out, the terms of the Award only compel the

Union to provide Southern with an ISL (and to thereafter commence negotiations for a JCBA).

Whether Atlas and the Union agreed under the Atlas CBA to participate in expedited merger

procedures in lieu of RLA Section 6 is a separate question that was to be determined (and was

later resolved in the affirmative) by the Atlas Board. The Southern Board did not purport to

resolve that question and its remedy does not have the effect of doing so. The Union's RLA-

based allegations thus provide no basis for vacating the Board's decision.[12]

### b. Duty of Fair Representation Under the NLRA

The Union also alleges that the Southern Board's decision "subject[s] [it] to potential

liability for breaching its duty of fair representation to the Atlas-Polar pilots." Compl. ¶ 47; see

Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998) ("When a labor organization has

been selected as the exclusive representative of the employees in a bargaining unit, it has a duty,

implied from its status under § 9(a) of the NLRA as the exclusive representative of the

employees in the unit, to represent all members fairly.").

The Union does not explain how its compliance with the Southern Board's order to

present an ISL in accordance with the Southern CBA makes its conduct toward Atlas pilots

"arbitrary, discriminatory, or [taken] in bad faith." Id. (citing Vaca v. Sipes, 386 U.S. 171, 190

(1967)). Airline mergers frequently require a balancing of competing interests between two pilot

groups, and courts have been reluctant to hold unions liable for violations of the duty of fair

---

[12] The Complaint also contains a barebones allegation that the Award "violates the due process rights" of the Union and the Southern and Atlas pilots. Compl. ¶¶ 39, 41. "Courts of Appeals have divided on whether [the RLA] precludes judicial review of NRAB proceedings for due process violations," Union Pac. R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment, Cent. Region, 558 U.S. 67, 75 (2009), and the D.C. Circuit has not yet weighed in. The Court need not reach this question, however, because the complaint contains no facts to support the Union's conclusory due process allegation. See Iqbal, 556 U.S. at 678.

representation under such circumstances.  See, e.g., Cunningham v. Air Line Pilots Ass'n, Int'l,

769 F.3d 539, 542-43 (7th Cir. 2014) (finding that union did not breach duty of fair

representation by negotiating CBA with employer airline carrier regarding longevity of pilots

following employer's merger with another carrier); cf. Air Line Pilots Ass'n, Int'l v. O'Neill,

499 U.S. 65, 81 (1991) (holding that "[a] rational compromise on the initial allocation of the

positions [between striking and working pilots] was not invidious 'discrimination' of the kind

prohibited by the duty of fair representation").[13]  Nothing in the Award obligates the Union to

favor one pilot group over another or purports to set the actual terms of the JCBA.  The Court

thus concludes that the Southern Board's decision was not inconsistent with the Union's

statutory duty of fair representation to either pilot group.[14]

C.  Injunctive Relief

In addition to asking the Court to vacate the Opinion and Award, the Complaint also

seeks preliminary and permanent injunctive relief to prevent Southern from enforcing it.  The

complaint does not identify any independent basis for such injunctive relief apart from its

allegations why the Court should vacate the Board's decision.  Because the Court has concluded

that those allegations do not have merit, the Court will deny the requested injunctive relief.

---

[13] This case can be distinguished from Bernard v. Air Line Pilots Ass'n, Int'l, AFL-CIO,
873 F.2d 213 (9th Cir. 1989), where the Ninth Circuit held that a union breached its duty of fair
representation to a pilot group by refusing to permit them to participate in negotiations with the
Company after a merger and by not complying with its own merger policy for merger with
union-represented groups.  See id. at 216.  The Complaint does not allege that the Award
compels the Union to do either.

[14] In any event, the Union does not explain how an *ex ante* risk of breaching its duty of
fair representation under the NLRA provides a basis for vacating an arbitration award issued
pursuant to the RLA.

## IV. Conclusion

For the foregoing reasons, the Court dismisses the Plaintiffs' petition to vacate the arbitration award. A separate order accompanies this memorandum opinion.

_____
CHRISTOPHER R. COOPER
Date: <u>January 28, 2020</u>                     United States District Judge